## FEDERAL DEPOSIT INS. CORPORATION v. VEST.

### No. 8567.

Circuit Court of Appeals, Sixth Circuit.

May 14, 1941.

Rehearing Denied Oct. 10, 1941.

Baldwin C. Burnam, of Louisville, Ky. (Wilson W. Wyatt, Baldwin C. Burnam, and Peter, Heyburn, Marshall & Wyatt, all of Louisville, Ky., and Francis C. Brown, of Washington, D. C., on the brief), for appellant.

Charles S. Adams, of Covington, Ky. (Rouse, Price & Adams, of Covington, Ky., on the brief), for appellee.

Before HICKS, ALLEN, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

Bill in equity by appellant as receiver of The Taylor National Bank, against appellee, on two promissory notes. The principal question here is, whether appellee is liable to the receiver upon a note for $10,000 executed to the bank by appellee on January 12, 1937. The District Court made accurate and complete findings of fact which we reproduce in the margin.[1] Upon these findings the court decided,—"(2) That in making the loan upon the note which

[1] "The Court finds from the pleadings and the evidence:

"(1) That the plaintiff, Federal Deposit Insurance Corporation, a corporation created by an act of the Congress of the United States, is the duly appointed, qualified and acting receiver of The Taylor National Bank, of Campbellsville, Kentucky, having been appointed as such receiver on the 24th day of August, 1937; that the said Taylor National Bank suspended active business on June 30th, 1937, and from that date, until the appointment of the plaintiff as its receiver, was administered by a Conservator appointed by the Comptroller of the Currency of the United States.

"(2) That the defendant, John L. Vest, an attorney residing at Walton, Kentucky, during the year 1931, became acquainted with T. O. Morton, the then president and chief executive officer of The Taylor National Bank, and from this acquaintance by 1935 there had developed a close and intimate friendship between Morton and the defendant.

"(3) That on January 24, 1935, without any previous arrangement or understanding Vest and Morton met in Louisville, Kentucky; that Morton then informed Vest that he, Morton, needed $10,000.00 for use in his own private business as distinguished from the corporate business of The Taylor National Bank, further telling Vest that The Taylor National Bank had on hand $100,000.00 in idle cash, and consequently he did not like to go to another bank for a loan, and yet preferred not to appear as a borrower from his own bank; that he requested Vest to sign an accommodation note for him for $10,000.00, payable to The Taylor National Bank, and agreed that, if Vest would sign such an accommodation note, he, Morton, would pledge as security, approximately $12,000.00 to $13,000.00 worth of collateral against the note; that Morton then stated that he had on hand 400 shares of Manhattan Railway Modified Guaranteed Stock, and $4,000.00 par value Cleveland Union Terminal Bonds, and gave Vest an informal written memorandum listing such security; that Morton further represented that if any criticism of the loan was offered by the bank examiners he would pledge additional security to its payment, that he would pay the interest upon the note, and if he desired to sell the collateral when it reached a satisfactory price he would pay the note in full, with the proceeds of the sale; that in reliance upon the representations of Morton, Vest signed a blank note, and contemporaneously signed and delivered to Morton a check, drawn on The Taylor National Bank for $10,000.00, which, at Morton's request, was made payable to the Bank of Commerce of Louisville, an institution of which Morton was also an officer; that thereafter Morton filled out the note for the sum of $10,000.00 and placed it in The Taylor National Bank, together with the collateral securities described in the memorandum and in accordance with the agreement, designating on the face of that note that there was pledged with it collateral security consisting of 400 shares Manhattan Railway Modified Guaranteed Stock and $4,000.00 par value Bonds of the Cleveland Union Terminal and shortly thereafter showed said note, so filled out, to Vest; that the loan was duly entered to the credit of Vest and his check was paid with the proceeds thereof; that Vest received none of the money represented by the loan and derived no benefit whatsoever from the transaction; that the collateral pledged to the payment of the note had at that time a value in excess of $12,000.00.

"(4) That Vest at Morton's request executed five renewals of the obligation [which had its origin as recited in paragraph (3) of these findings] such renewals on each occasion being executed by Vest in blank and delivered to Morton who later filled in the body of the several notes, the last renewal being the note upon which this action was instituted; that this note bears the date of January 12, 1937, is for the sum of $10,000.00, payable to The Taylor National Bank six months after the date thereof, and bears upon the face thereof the statement: 'Collateral—$4,000.00 Allegheny Corp. 5% Bonds, 1944, and excess'; that the two preceding renew-

he induced Vest to sign, Morton was acting within the scope of his authority. Morton, being the Bank's sole representative in procuring the note, it cannot claim any right to it except such as it acquired through him, and it cannot take the benefit of his act without taking also the burdens resulting from the agreement which he made and under which he procured the note to be executed and the withdrawal of the collateral pledged with the original note. The evidence clearly showing a breach of the contract, pursuant to which the note was executed, notice of which, under the 'sole actor' doctrine, is imputed to the Bank, recovery on the note of $10,-000.00 is thereby precluded."

We entertain a contrary view.

On June 16, 1933, Congress, as an addition to the Federal Reserve Bank Act of 1913, enacted a provision that "no executive officer of any member bank shall borrow from or otherwise become indebted to any member bank of which he is an execu-tive officer, and no member bank shall make any loan or extend credit in any other manner to any of its own executive officers." This provision was in effect on January 24, 1935, when the original transaction between appellee and Morton took place and has continued as the law. 12 U.S.C.A. § 375a. One of its principal purposes was to decrease the hazard of one-man-bank control.

█ The act was violated. Morton got $10,000.00 from the bank upon appellee's note. The defense, as averred in the answer to the bill and as set up in the proof, was, that by virtue of an agreement between Morton and appellee, the original note and its various renewals were nullities. We think the defense must fail. Morton had no authority from the bank to make such an agreement. His role was that of borrower and not as representative of the lending bank. He was the only bank official active in the transaction and he obviously did not, nor could, represent the bank, since he was dealing with himself. It was posi-

---

als of the note, dated respectively June 21st, 1936, and February 21st, 1936, were in form identical with the note upon which this suit was brought, each of said renewals being for the sum of $10,000.00, and in addition to the customary formal provisions of the note, bearing the same endorsement with reference to the collateral; that the original note and the first and second renewals did not contain the words 'and excess'; that the second renewal of the note, dated July 23rd, 1935, bore the endorsement: 'Collateral $4,000.00 Cleveland Union Terminal 5% Bonds 1973; 200 Manhattan Railway Co. Modified Guaranteed'; that the original note and first renewal bore the following endorsement as to collateral: '$4,000.00 Cleveland Union Terminal 5% Bonds 1973; 400 Manhattan Railway Co. Modified Guaranteed'; that all interest on the original note and the subsequent renewals thereof that was paid was paid by Morton, personally, except on the first renewal when it was paid by Vest with money furnished by Morton; that no part of the principal of said note has been paid and that unpaid interest thereon, as of January 12, 1937, amounted to $695.01.

"(5) That the wording—'and excess' —in banking parlance means that any excess security on any other obligation of the maker to the payee shall be held subject to the note upon which such phraseology is employed; that Vest at no time agreed that any excess col-lateral which he might have on any loan with The Taylor National Bank should be pledged as collateral security to the payment of the accommodation loan, nor did he at any time authorize any person to write the words 'and excess' upon the face of any of the notes.

"(6) That on December 13th, 1935, Vest borrowed from The Taylor National Bank, for his personal use, the sum of $2,500.00, to secure the payment of which he pledged 500 shares of the capital stock of Formica Insulation Co., which loan went through successive renewals down to the last note, dated May 12th, 1937, which is the second note involved in this suit, and upon which the defendant at all times admitted liability, there having been pledged as collateral security to its payment the said 500 shares of capital stock of Formica Insulation Co., which stock has a value in excess of the amount due upon said note.

"(7) That upon the suspension of business by The Taylor National Bank there was a credit to the deposit account of John L. Vest in the sum of $50.00; that the plaintiff credited the said $50.00 upon the $10,000.00 note; that Vest objected to this placing of said credit and directed that said credit be applied to the $2,500.-00 note, and on September 24th, 1937, offered to pay said $2,500.00 note in full by tendering in payment thereof the sum of $2,454.28, this being the agreed amount then due upon said note, if Vest was entitled to have the $50.00 deposit credited

tively forbidden to make such a loan. Morton took the money in violation of law and appellee's part in the transaction was to permit his notes to be carried by the bank as a screen to conceal the violation.

█ It is a criminal violation for any person with intent to defraud or injure, to aid or abet any officer of a bank in the wilful misapplication of its money. 12 U.S. C.A. § 592. It is also provided (Title 18 U.S.C.A. Ch. 15, § 550) that "whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

Curiously enough, these statutes were not presented to the District Court for consideration. We must consider them here.

Appellee, by active connivance with Morton, permitted his note and its renewals to remain as receivables among the assets of the bank for more than two years for the admitted purpose of concealing the fact that Morton was a borrower from his own bank. The bank examiners naturally were deceived. Had the truth become disclosed the Comptroller of the Treasury would no doubt have taken corrective measures at once.

█ It is urged that appellee as a matter of fact did not know that the statute prohibited Morton from borrowing the bank's money. The record does not disclose whether this is true or not, but it is of course immaterial as a matter of law. Appellee cannot avoid the rule that he intended the natural consequences of his acts. It is beside the point to say that he acted in good faith and without intent to defraud the bank or its creditors. The vital question is, whether he wittingly or unwittingly was a party to an act made unlawful by the National Banking law and of this there can be no doubt. It is unfortunate and regrettable

thereon; that plaintiff declined this tender and Vest thereafter paid said amount of $2,454.28 into the registry of this court.

"(8) That at the suspension of business by The Taylor National Bank on June 30th, 1937, there appeared to be pledged to secure the $10,000.00 note only $4,000.00 par value Bonds of the Allegheny Corporation, which bonds were found to be the property of certain trustees who had placed them in the Bank for safe keeping, the use of which by Morton as collateral on the note was entirely unauthorized, and which bonds have been recovered heretofore in this action by the owners; that until the last of March or early in April, 1937, Vest did not know that any of the collateral originally pledged against the note had been removed, although he was aware that Morton had reserved the right to change the collateral from time to time, but through a telephone call from Morton, Vest discovered the deficiency in the collateral which Vest still believed to be against the note, Morton saying that he 'got in a jam and transferred it and could not put it back for a few days'; that as soon thereafter as convenient, viz:—on April 12th, 1937, Vest went before the Board of Directors of The Taylor National Bank and disclosed to them the facts with reference to this accommodation note and the removal of the collateral.

"(9) That on September 6th, 1935, when the second renewal note showed a reduction in the collateral of 200 shares of Manhattan Railway Modified Guaranteed Stock, the 200 shares of such stock had a value slightly in excess of $5,000.-00; that on March 3rd, 1936, when the third renewal of the $10,000.00 note came into the Bank, that being the first note which showed the absence of the remaining 200 shares of Manhattan Railway Modified Guaranteed Stock and $4,-000.00 in Cleveland Union Terminal Bonds, the said 200 shares of Manhattan Railway Modified Guaranteed Stock had a value of approximately $4,200.00, and the $4,000.00 par value Cleveland Union Terminal Bonds had a value of approximately $4,290.00; that on the day of the trial of this action, May 5th, 1938, the $4,000.00 par value Allegheny Corporation 5% Bonds had a value of $2,-443.00; that Vest at no time authorized or agreed to the change in the collateral security pledged upon the $10,000.00 note and its renewals; that Morton removed the original collateral pledged to secure the note and used it for his own purposes without the authorization or approval or knowledge of Vest.

"(10) That at all times referred to, Morton was not only the president and chief executive officer, but owned 76% of the capital stock of The Taylor National Bank and was in exclusive control of the Bank and directed all of its operations; that he exercised the corporate will of the Bank in all matters, and the acts of all other officers were merely perfunctory; that he dominated the Board of Directors and the Loan Committee of said Bank; that The Taylor National Bank was a typical 'one man bank.' "

that he was duped by an unfaithful bank executive, but it is not an excuse. That Morton in the early stages undertook to indemnify appellee by the pledge of collateral is not material.

We think the case must be determined in the light of Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694, decided February 12, 1940, more than three months after the decree herein appealed from. Greaney, a director of a national bank, was sued by its receiver upon a note knowingly given to the bank as a substitute among its assets for shares of its stock illegally purchased and retained. The bank was prohibited by the National Banking Act from purchasing and retaining its own shares. 12 U.S.C.A. § 83.

The court said (309 U.S. at page 195, 60 S.Ct. at page 482, 84 L.Ed. 694):

"The provisions of the Act requiring periodic examinations and reports and the powers of the Comptroller are designed to insure prompt discovery of violations of the Act and in that event prompt remedial action by the Comptroller. These purposes would be defeated and the command of the statute nullified if a director or officer *or any other by his connivance* could place in the bank's portfolio his obligation good on its face, as a substitute for its stock illegally acquired, and if he remained free to set up that the obligation was, in effect, fictitious, intended only to aid in the accomplishment of the injury at which the statute is aimed.

"Here, respondent, with full knowledge of the unlawful purpose to conceal the presence of the stock among the bank's assets, gave in exchange for it, first another's note and then his own, knowing that it was to be availed of as an apparently valid and lawful asset so as to forestall the remedies available under the statute for the unlawful purchase. * * *" (Italics ours.)

Again: "But it is enough for present purposes that the respondent, after placing his note among the bank's receivables in substitution for the shares of stock, as the means of avoiding the consequences of violation of the statute, may not now take the benefit of the secret and illegal agreement that his note except for purposes of deceiving the bank examiners was to be regarded as a nullity. If respondent were free to set up the unlawful agreement as a defense and thus cast the loss from the unlawful stock purchase on the creditors of the bank in receivership, he would be enabled to defeat the purpose of the statute by taking advantage of an agreement which it condemns as unlawful. That, we think, the law does not allow."

Again: "It is a principle of the widest application that equity will not permit one to rely on his own wrongful act, as against those affected by it but who have not participated in it, to support his own asserted legal title or to defeat a remedy which except for his misconduct would not be available. See United States v. Dunn, 268 U.S. 121, 133, 45 S.Ct. 451, 454, 69 L.Ed. 876, Independent Coal & Coke Co. v. United States, 274 U.S. 640, 648, 47 S.Ct. 714, 717, 71 L.Ed. 1270. Applied in cases like the present, the rule that the illegal agreement may not be set up to defeat the obligation of the note is sometimes denominated an equitable estoppel. * * * But stated more precisely, the doctrine with which we are now concerned is not strictly that of estoppel as thus defined. It is a principle which derives its force from the circumstances that respondent's act, apart from its possible injurious consequences to creditors, is itself a violation of the statute; and that the statute, read in the light of its purposes and policy, precludes resort to the very acts which it condemns, as the means of thwarting those purposes by visiting on the receiver and creditors whom he represents the burden of the bank's unlawful purchase. * * *" (citing authorities).

Again: "Since it is by virtue of the statute that respondent's agreement is unlawful and that the benefit of it as a defense to the note is denied; and as the purpose of the statute is to protect creditors of the bank from the hazard of violations of the Act like the present, it is immaterial that the bank's officers were participants in the illegal transaction * * *."

We have quoted liberally from the Greaney case because we regard it as decisive. Being so, there is no necessity for an extended discussion of the "sole actor" theory upon which the District Court dismissed the bill. Further, we need not determine whether, under the parol evidence rule, appellee should be permitted to make his defense. He was allowed a liberal application of the rule in the court below.

Finally, we think that the District Court was correct in holding that appellee was entitled to have returned to him the 500 shares of Formica Insulation Company common stock. There is no substantial proof that appellee ever pledged this stock as collateral upon his $10,000 note.

The decree appealed from is reversed and the case remanded to the District Court, with directions to enter a decree against appellee in accordance herewith.