## Vest v. Goode et al.

March 23, 1948.

G. J. Rice for appellant.

George O. Bertram and Fred Faulkner for appellees.

OPINION OF THE COURT BY JUDGE KNIGHT—Affirming.

This appeal arises out of the failure of the Taylor National Bank of Campbellsville, Ky., which was placed in the hands of a receiver on June 30, 1937, and which failure, we gather from this record and reports of other litigation arising therefrom, resulted from the financial manipulations and speculations of T. O. Morton, president and executive officer of that bank. He apparently exercised the corporate will of the bank in all matters and the acts of all other officers were merely perfunctory. He dominated the board of directors and the loan committee of the bank and, as was said in the Federal Court case that will hereinafter be referred to, "The Taylor National Bank was a typical 'one man bank.'" During the last few years of the bank's active existence and when Morton could no doubt see the handwriting on the wall and that he was riding for the inevitable fall, he began to shift collateral held by the bank on various loans, substituting collateral to serve his purposes of the moment and to deceive bank examiners on their periodical visits to his bank. Another device to which he resorted was to obtain money from his own bank for his own use by inducing his friends over the state to execute their individual notes to his bank and turn the proceeds over to him, the nominal borrower obtaining none of these proceeds. Morton would assure his friendly victims against any possible loss by attaching to the executed note as collateral, securities belonging to Morton valued in excess of the note. The note would show on its face the specific collateral securing it and, with faith in the honesty of Morton, his victims felt no fear of loss from the execution of these accommodation notes for the benefit of their friend Morton. As these notes would become due, Morton would mail the makers new notes to be signed in blank, as they obligingly did on his assurance that the collateral on the original note

would continue as the collateral on the renewed note. It was then that Morton would begin his collateral shifting process, either withdrawing all or part of the collateral securities for use elsewhere, substituting securities of lesser value, or, as in the present case, substituting securities owned by others that happened to be in the bank at the time for safekeeping or other purposes.

Among Morton's victims was appellant, an able and highly respected lawyer from northern Kentucky, some 140 miles from Campbellsville, scene of Morton's operations. He had signed one of the accommodation notes for Morton's benefit at his request on January 25, 1935. He renewed it in blank from time to time, the last renewal being on January 12, 1937. This note was among the assets of the bank when it closed on June 30, 1937. Suit was brought on this note by the Federal Deposit Insurance Corporation, receiver of the bank, and that suit resulted in a judgment against appellant for the full amount of the note plus interest and costs. That case is reported as Federal Deposit Insurance Corporation v. Vest, 6 Cir., 122 F. 2d 765, 768, and in that opinion and the note thereto will be found a more complete statement of facts than is shown in this opinion as the background for the litigation involved in the case at bar.

### Basis of Present Suit

The present suit was brought by appellant against appellees, Wayne Goode, H. T. Parrott, J. H. Miller and Oma Goode, as directors of the defunct bank at the time of the execution of the note heretofore referred to and at the time of the bank's closing, for the recovery of the $13,285.65, being the full amount of the judgment, interest and costs adjudged against him in the Federal Court and which he has paid. T. O. Morton was a defendant in the lower court but is not a party to this appeal.

It is a little difficult to gather from the extensive pleadings, consisting of a petition and three amended petitions totaling 33 pages, the exact basis of recovery sought by appellant against appellees. In the original petition and the first amended petition, it had been alleged in substance as follows:

On January 25, 1935, appellant executed to the Tay-

lor National Bank his note for $10,000 and immediately turned over the entire proceeds to Morton, at whose request the note was executed. The execution of the note was purely an accommodation for the benefit of Morton and, in order to secure appellant against any loss, the note was collateraled with 400 shares of stock of the Manhattan Railroad Co. (modified) of New York, hereinafter called the "Manhattan Stock," and 4,000 par value bonds of the Cleveland Terminal of Cleveland, Ohio, hereinafter called the "Terminal Bonds," which security at that time had a market value of approximately $12,500 and was owned, or supposedly owned, by Morton. This note, without any reduction in the principal, was renewed from time to time by appellant who executed new notes in blank, the last renewal being on January 12, 1937. About April 4, 1937, Morton called appellant by long distance telephone and informed him that he (Morton) had temporarily removed part of the collateral on said note, giving some plausible explanation that the National Bank examiners were then making an examination of the bank and that, should they contact appellant, he would know that part of the collateral had been temporarily removed. He was assured by Morton that it would be replaced within a few days and he assured appellant that he would explain everything when he saw him. Growing suspicious, appellant drove the 140 miles to Campbellsville. Apparently he did not see Morton there but had a meeting with appellees herein, then officers and directors in the bank, and informed them about all the facts surrounding the execution of the note as related above. It is alleged that at that meeting appellees disclosed to plaintiff that Morton had used this particular collateral of 400 shares of Manhattan Stock for his own personal purposes and not for the benefit of the bank and that they assured plaintiff that said collateral then missing would be replaced within a few days and would again become collateral on said note. It is further alleged that as a matter of fact on the date of this meeting with defendants on April 12, 1937, all the collateral originally securing the note executed by appellant had been removed by Morton and there had been substituted therefor $4,000 Alleghany 5% bonds which were in fact the property of the Christian Church of Campbellsville, Ky.

It is further alleged that this fact was known to all of the appellees and fraudulently concealed by all of them from the appellant. It is further alleged that appellant, not knowing these conditions, was requested by appellees to permit said note to remain among the assets of the bank in order to give Morton an opportunity to replace the temporarily abstracted collateral.

However, in the closing paragraphs of the second amended petition appellant seeks to sum up and make clear the real and final basis of appellees' liability to him and we adopt as his theory of the case the language used by him for that purpose, and which we quote as follows:

"The promise to replace the temporarily abstracted collateral within a few days made by the defendant Morton in the presence of the other defendants and their acquiescence and concurrence in his promise thus made, is merely an incident of the occasion and not the real basis of plaintiff's complaint, which real basis is again repeated. It is that said note for $10,000.00 signed by plaintiff instead of being in words and figures as follows:

"$10,000.00 Campbellsville, Kentucky
January 25, 1935

Ninety days after date, I promise to pay to the order of the Taylor National Bank, Ten Thousand and no/100 Dollars, negotiable and payable to the Taylor National Bank of Campbellsville, Kentucky value received with interest at the rate of 6 per centum per annum from date until paid. If it becomes necessary to collect this note by legal process, we agree to pay attorney's fee of ————. COLLATERAL $4,000.00 CLEVELAND UNION TERMINAL 5% BONDS 1973. 400 SHARES MANHATTEN RAILWAY COMPANY MODIFIED GUARANTEED.

John L. Vest"

was in words and figures as follows:

"$10,000.00

Campbellsville, Kentucky
January 12, 1937

Six months after date I promise to pay to the order of the Taylor National Bank, Ten Thousand Dollars, nego-

tiable and payable at the Taylor National Bank of Campbellsville, Ky., value received with interest at the rate of six per centum per annum from maturity until paid. If it becomes necessary to collect this note by legal process, we agree to pay attorney's fee of ———. COLLATERAL $4,000.00, ALLEGHENY CORP. 5% BONDS 1944 & EXCESS.

John L. Vest''

(Capitalization in both quotations ours.)

''The defendants knew the real and true conditions of the note and the plaintiff did not, and it is the failure of the defendants or any one of them to inform plaintiff of the true condition of the note when they, each and all of them, then and there knew both the true condition of the note and also each then and there knew that the plaintiff did not know the true condition, and further misled him and confirmed his erroneous belief by working with him in ascertaining the then market value of the collateral which plaintiff then believed secured the payment of said note, not by its actual physical presence on said note or with said note, so far as the 400 shares of Manhattan stock was concerned, because he had been falsely told that this had recently been removed, but by reason of the fact that the plaintiff then and there believed that the $10,000.00 note showed on its face that it was so secured, while as a matter of fact, it did not so show.

''As a matter of fact, there was pledged with the plaintiff's $10,000.00, $4,000.00 Allegheny bonds for which the defendant, Oma Goode, was then and there trustee, wholly unknown to the plaintiff.''

To the petition and three amended petitions, appellees filed a general demurrer. The chancellor in a comprehensive and well considered opinion sustained the demurrer and dismissed appellant's petition and amendments thereto. From that order appellants prosecute this appeal.

### The Law Of The Case

In his brief appellant seems to pitch his case on the ground of actionable fraud or deceit on the part of appellees and cites the cases of Peake v. Thomas, 222 Ky. 405, 300 S. W. 885, and Beck v. First National Bank

etc., 250 Ky. 764, 63 S. W. 2d 937, in which this court set out the six things that must appear to constitute actionable fraud or deceit. These six requirements will not be repeated here but we accept them as embodying the universally accepted definition of actionable fraud applicable to situations to which they properly apply.

While there are some allegations in the petition and first amended petition charging actual misrepresentation to appellant by appellees concerning the note and collateral at the meeting of April 12, such allegations appear to be abandoned in the second amended petition, as quoted above, in which appellant sets out the real basis of his complaint which is that the appellees, knowing the true conditions surrounding the note and collateral and knowing that he did not know them, failed to inform him of these conditions by reason of which he suffered the loss which he is now seeking to recoup. He contends that the deceit and fraud consisted of appellees' duty to speak and their failure to do so when they knew the situation with reference to the shift of collateral when he did not know it.

But was it not his duty to do something for his own protection at this meeting with appellees? He had known Morton since 1931 and they were friends. He had warning that something was wrong when Morton telephoned him about the temporary shift in collateral on the note due to the presence of the bank examiners. Appellant was an experienced attorney and the natural thing for him to do was to make an investigation when he went to Campbellsville. He knew he had been signing blank renewal notes for the past two years. For his own protection he should have called for the latest renewal of his note. Had he done so, it would have shown on its face that the collateral which secured the original note had been changed and he could then have taken steps to protect himself. Instead, he chose to rely on the promises of the appellees that they would make every effort to get the original collateral restored on the note. We think the loss was occasioned as much, or more, by appellant's negligence and failure to make a proper investigation and take steps to protect his own interests as it was by the failure of the appellees to speak up and warn him of the status of the transaction between him and Morton with which they had had

nothing to do. Appellant cites several old Kentucky cases in support of his ''duty to speak'' theory, such cases as Bowman v. Bates, 2 Bibb 47, 4 Am. Dec. 677; Mills' Heirs v. Lee and Graham, 6 T. B. Mon. 91, 17 Am. Dec. 118, and Taylor v. Bradshaw, 6 T. B. Mon. 145, 17 Am. Dec. 132; Singleton's Adm'r v. Kennedy-Smith & Co., 9 B. Mon. 222, 48 Ky. 222, and the more recent case of Hays & Meyers, 139 Ky. 440, 107 S. W. 287, 17 L. R. A., N. S., 284, 139 Am. St. Rep. 493. These cases are interesting and are still good law but they arise out of entirely different factual situations from the one we have here. They involved direct dealings between the parties in which one side did not disclose certain facts known to him and unknown to the other party and from which failure to disclose, the party so failing profited. In all of those cases there was a contractual relationship between the parties and one of the contracting parties took advantage of certain information which he had and which he knew the other did not have to gain an unfair advantage for himself. That situation does not prevail here. There was no contractual relationship between appellant and appellees. Appellant's dealings had all been with Morton who, it was held in the Federal Court case heretofore referred to, represented himself, not the bank, in the illegal transaction between appellant and Morton. We do not think the ''duty to speak'' doctrine, so urgently put forward by appellant, is applicable to the facts in this case.

But conceding arguendo, that it was the duty of appellees to speak and inform appellant of the change in collateral that had been effected by Morton and that appellant himself was guilty of no negligence in signing renewals in blank for two years and in failing to call for the note at the meeting with appellees on April 12, were these failures the approximate cause of appellant's loss? In his brief, appellant goes into a long speculative discussion of the steps he could have taken to protect himself had he been informed at the meeting of April 12 of the condition of the note as it then existed instead of its condition as he believed it then existed. Among the steps which he now suggests in retrospect that he would have taken is to have filed a suit to bring about a change of existing conditions by causing the production of the removed securities; by instituting a

suit to recover of the bank the market value of the collateral at the time of its removal or to enforce a credit on the note of the market value of the securities at the time of their conversion or removal by Morton. We think the speculative nature of this prospect is well shown in the opinion of the judge of the lower court in which he detailed the practical impossibility of appellant's obtaining any court action in the brief period between the date of this meeting on April 12 and the date of the bank's closing on June 30, with no term of court in that district due to begin until the following September, and with the delays and dilatory tactics that could have blocked appellant's moves. The bank was on its last legs and Morton was riding to his fall and it is entirely speculative to say that appellant could have pulled himself out of his predicament if the appellees had informed him of the condition of the note on the day of the meeting.

From careful reading of the entire record, including the opinion of the Circuit Court of Appeals in the case of Federal Deposit Insurance Corporation v. Vest, 6 Cir., 122 F. 2d 765, 768, it appears to us that the appellant, amiable gentleman and good lawyer that he is, is the architect of his own fate and must stand the loss resulting from the transaction he entered into for the accommodation of his friend Morton and, which the Circuit Court of Appeals said, was a violation of the federal law. From that opinion we quote the following: "Appellee (Vest) by active connivance with Morton, permitted this note and its renewals to remain as receivables among the assets of the bank for more than two years for the admitted purpose of concealing the fact that Morton was a borrower from his own bank. The bank examiners naturally were deceived. Had the truth become disclosed the Comptroller of the Treasury would no doubt have taken corrective measures at once.''

We think the loss sustained by appellant was due directly to the illegal transactions he had with Morton, howsoever innocent he may have been of his illegal act, and he cannot now lay that loss to the appellees; that there was no actionable fraud or deceit on the part of appellees against appellant and that there was no duty of appellees to speak under the circumstances developed in this case. For the reasons herein indicated, the judg-

ment of the lower court sustaining the demurrer to the petition is therefore affirmed.

Judgment affirmed.