KENTUCKY LABORERS DISTRICT COUNCIL HEALTH AND WELFARE TRUST FUND, et al., Plaintiffs,

v.

HILL & KNOWLTON, INC., et al., Defendants.

Civil Action No. 3:97–CV–394–H.

United States District Court, W.D. Kentucky, Louisville Division.

Sept. 30, 1998.

Linda J. Wallbaum, Charles Robert Isenberg, Herbert L. Segal, Irwin H. Cutler, Jr., Segal, Isenberg, Sales, Stewart, Cutler & Tillman, Louisville, KY, Kenneth J. Vianale, Beth A. Kaswan, Michael C. Spencer, Joan T. Brown, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Robert J. Connerton, John Broadus, James S. Ray, Connerton & Ray, Washington, D.C., G. Robert Blakey, South Bend, IN, Einer Elhauge, Cambridge, MA, Mitchell M. Breit, Weitz & Luxenburg, New York City, for Plaintiffs.

Bruce M. Ginsberg, Davis & Gilbert, New York City, for Hill & Knowlton, Inc.

William D. Grubbs, Woodward, Hobson & Fulton, Louisville, KY, Matthew J. Calvert, Hunton & Williams, Atlanta, GA, Jack E. McClard, Brian V. Otero, Hunton & Williams, Richmond, VA, for Philip Morris.

Charles S. Cassis, Robert Y. Gwin, Brown, Todd & Heyburn, Louisville, KY, Jeffrey J. Jones, Matthew A. Kairis, Jones, Day, Reavis & Pogue, Columbus, OH, for R.J. Reynolds Tobacco.

David S. Bernick, Kirkland & Ellis, Chicago, IL, Charles S. Cassis, Brown, Todd &

Heyburn, Louisville, KY, Kenneth N. Bass, Paul R. Taylor, Karen McCartan DeSantis, Kirkland & Ellis, Washington, D.C., William C. Boone, Jr., Louisville, KY, for Brown & Williams Tobacco.

John J. McLaughlin, Charles H. Cassis, Goldberg & Simpson, Louisville, KY, Mary Elizabeth McGarry, Adam I. Stein, Kathy McFarland, Simpson, Thacher & Bartlett, New York City, for B.A.T. Industries.

Edward H. Stopher, Boehl, Stopher & Graves, Louisville, KY, Bruce Tepekian, Shook, Hardy & Bacon, Kansas City, MO, for Lorillard Tobacco.

Maria Santacroce, Michael M. Fay, Kasowitz, Benson, Torres & Friedman, New York City, Darryl William Durham, Louisville, KY, for Liggett Group.

Thomas J. Collins, David J. Hooker, Thompson, Hine & Flory, Cleveland, OH, Jack F. Fuchs, David A. Eberly, Thompson, Hine & Flory, Cincinnati, OH, Steve Klugman, Harry Zirlin, Steve Michaels, Debevoise & Plimpton, New York City, for Council for Tobacco Research.

John T. Ballantine, Jr., Ogden, Newell & Welch, Louisville, KY, for The Tobacco Institute.

Eric L. Ison, Margaret E. Keane, Gregory S. Metzger, Greenebaum Doll & McDonald, Louisville, KY, for Smokeless Tobacco Council.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Plaintiffs and the proposed class members in this action are non-profit union multi-employer health and welfare trust funds (the "Funds") that pay medical expenses incurred by those employed under various collective bargaining agreements and their dependents (the "Participants"). Defendants are the eight major tobacco companies and certain tobacco-affiliated research and public relations firms. The Funds allege that Defendants have engaged in a conspiracy to deceive the general public, including the Funds, about the health risks of smoking.

The Amended Complaint details a lengthy pattern of tobacco industry deception. It says that Defendants concealed information about the ill effects of smoking and its addictive consequences; lied to the public and public health officials about tobacco's health hazards; and actively conspired to delay any plans to make tobacco use safer or less addictive. As a consequence, many of the Participants began smoking or continued to do so. Many of them developed smoking-related diseases or medical problems. The similarity of these allegations to those in numerous other lawsuits filed by health and welfare plans around the country does not detract from their seriousness. Though tobacco was and is a legal product, the allegations against the industry would constitute a civil conspiracy of a scope and duration unparalleled in American history. The consequences of that conspiracy would be immense, affecting the entire fabric of American society.

As public officials have learned more about the health impact of smoking, the way that the tobacco industry marketed its products, and the extent to which it may have concealed its own research, a lively debate has ensued about the tobacco industry's responsibility for the many individual and societal costs related to tobacco use. Those concerned will continue to debate these issues in a variety of legislative and political arenas. The broad social ramifications of that debate are far outside the scope of this lawsuit. No doubt the political, economic, moral, and legal complexities of this issue may well require a legislative solution.

Our inquiry is much more limited. It is not to pass upon the evils of tobacco use nor to consider the moral corruptness of the tobacco industry. It is to determine whether the Funds have stated any legal claims in this forum. On a motion pursuant to Rule 12(b)(6), dismissal of the complaint is proper only if it is clear that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). Therefore, the Court's task is to determine whether, assuming all their allegations are true, the Funds may assert the causes of action stated and to pursue the damages described. Counsel have greatly assisted the Court in its task by providing comprehensive

briefs and superb oral argument during a lengthy hearing.

## I.

The Funds assert a variety of different statutory and common law claims. They allege causes of action under RICO, the Sherman and Clayton Acts, and the Kentucky Consumer Protection Act, and common law theories including intentional misrepresentation, intentional breach of a special duty, and unjust enrichment. They have withdrawn their claims of negligence, breach of express/implied warranty, and strict liability. The Funds seek various forms of relief including: (1) damages measured by their health care expenditures for medical treatment to Participants who suffered from smoking-related illnesses; (2) treble damages for any antitrust and RICO injuries; (3) punitive damages; and (4) a host of injunctive remedies, including disclosure of suppressed information and funding of smoking cessation and public education programs.

A careful review of the Amended Complaint, the Funds' memoranda, and the transcript of oral argument, reveals two distinct theories of conduct and injury. For each theory, the mechanism of injury and the measure of damages differ in subtle but important ways. In the first and broader category, the Funds claim that Defendants misled the Participants about the dangers of smoking causing them to develop smoking-related illnesses. As a consequence, the Funds paid for the Participants' medical treatment. In this category, Defendants' alleged wrongdoing is directed toward the Participants; the Funds' injuries are their Participants' medical expenses. The Court will refer to these allegations as "Category One Claims."

In the second category, the Funds contend that Defendants' conspiracies, misrepresentations, and deceptions prevented the Funds from pursuing proactive measures such as smoking cessation programs and other educational efforts to reduce smoking among the Participants. According to this theory, if Defendants had fully disclosed their research into the health consequences of tobacco, the Funds would also have altered their coverages, deductibles, or co-payments to deter Participants from smoking. Because of Defendants' misconduct, the Funds were prevented from reducing expenditures for smoking-related illnesses. In this category, Defendants' misrepresentations were made directly to the Funds; the Funds' injuries are only that portion of their Participants' medical expenses which, but for Defendants' wrongdoing, the Funds could have prevented. The Court will refer to these allegations as the "Category Two Claims."

Reviewing the Amended Complaint reveals that the Funds may have asserted Category One Claims in their virtually all of their counts under both federal and state law. In oral and written arguments, the Funds have shown considerably less confidence that their Category One Claims can withstand judicial scrutiny. Therefore, the Court will consider first this broad category of claims. The Court will next consider a more interesting and debatable question of whether the Funds have standing to assert their Category Two Claims under any of their other theories, in particular under antitrust and RICO.

## II.

Over the past one hundred years, state and federal courts have developed sound reasons to disfavor claims by remote plaintiffs for derivative injuries. To the extent the Funds assert Category One Claims in any cause of action in the Amended Complaint, the Court concludes that they must be dismissed because the Funds are remote complainants and their alleged damages are solely derivative of the Participants' injuries. These remote injury claims are barred whether the specific cause of action arises under statute or common law.

At common law, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992) (incorporating remoteness jurisprudence into the test for RICO standing). This concept is thoroughly in-

grained in American law. Kentucky is no exception to the general rule. *See Shields v. Booles*, 238 Ky. 673, 38 S.W.2d 677, 679 (1931). Over the past century, the practice of precluding recovery for remote injuries has appeared in many forms, including "foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract." *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 905–06, 74 L.Ed.2d 723 (1983) (including concern for remoteness in the test for antitrust standing). Each of these conceptually related doctrines reflects "a demand for some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 112 S.Ct. at 1318. As stated succinctly by Justice Holmes, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Southern Pacific Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451 (1918).

 In cases such as *Holmes* and *Associated General Contractors*, the Supreme Court elaborated on the sound policy reasons underlying the centuries-old common law rule denying recovery for remote injuries. It is undisputed that these cases demonstrate the continuing vitality of the traditional doctrine. As to the Category One Claims, the Court concludes that these claims are so remote from and derivative of more direct

personal injury claims that a long line of American Jurisprudence suggests the Funds cannot survive a motion to dismiss.[1]

As a starting point, the Court has considered case law involving the ability of insurers to recover medical expenses resulting from injuries to their insureds. This seemed fair because the Funds are health and welfare trust funds governed by the Employee Retirement and Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* They function somewhat like health insurers by providing certain health benefits to their Participants and paying their claims. *See* 29 U .S.C. § 1002(1). At the oral argument, the Funds' counsel conceded that any general rule applied here should also apply to insurance companies. Counsel acknowledged that whatever the differences between the Funds and insurance companies, those differences do not determine the outcome of our case. In an early leading case, *Connecticut Mutual Life Insurance Company v. New York and New Haven R.R. Co.*, 25 Conn. 265 (1856), the Supreme Court of Connecticut held that an insurer could not bring a negligence action against a tortfeasor responsible for the death of its insured. *See id.* at 274–75. While acknowledging that the plaintiff's injury was indirectly caused by the defendant's actions, the Court nonetheless found the causal connection too remote. *See id.* at

---

1. The Funds cannot survive a Rule 12(b)(6) motion on their Category One Claims under federal statutes because they lack what the Supreme Court calls antitrust or RICO "standing." "Standing" is somewhat of a misnomer, suggesting the need for a Rule 12(b)(1) motion addressing the lack of a "case or controversy" rather than a 12(b)(6) motion alleging the failure of proof on a required matter. Nevertheless, antitrust or RICO standing is a necessary element of a RICO or antitrust claim. The standing requirement arises out of similar language in the two statutes mandating that a plaintiff prove an injury "by reason of" the defendant's misconduct. In *Holmes* and *Associated General Contractors*, the Court understood that statutory phrase to invoke, not only the concept of but for cause, but also the broader notion of proximate cause. The Court explained that an analysis of proximate cause leads directly to consideration of the traditional concept of remoteness. *See Holmes*, 112 S.Ct. at 1316–19; *Associated General Contractors*, 103 S.Ct. at 904–09.

Similarly, to the extent that the Funds' assert Category One Claims under common law, they also fail on a motion to dismiss because they lack required proof of proximate cause. Unlike some states, Kentucky reads a proximate cause requirement into the sort of intentional torts that the Funds allege. *But cf. City and County of San Francisco v. Philip Morris, Inc.*, 957 F.Supp. 1130, 1141 (N.D.Cal.1997) (explaining that California holds one making intentional misrepresentations liable to any person reasonably likely to act on the misinformation). Thus, to prove intentional misrepresentation, a plaintiff must establish that the defendant's deceit proximately caused the injury. *See Vest v. Goode*, 307 Ky. 52, 209 S.W.2d 833, 836 (1948). A highly speculative chain of causation will not suffice. *See id.* 209 S.W.2d at 837. In other words, Kentucky common law firmly incorporates the doctrine that remoteness of injury constitutes a bars to a fraud claim.

276–77.[2] Recovery of payments made under the life insurance policy could be accomplished only through the equitable doctrine of subrogation. *See id.* at 277.

Since that time, courts have consistently applied this logic to dismiss tort suits brought by insurance companies, the government, and employers to recover for injuries to third parties. *See United States v. Standard Oil Co. of California,* 332 U.S. 301, 67 S.Ct. 1604, 1610–12, 91 L.Ed. 2067 (1947) (federal government could not recover medical expenses resulting from negligent injury of soldier); *Edward F. Heimbrock Co. v. Marine Sales and Serv., Inc.,* 766 S.W.2d 70, 71–72 (Ky.Ct.App.1989) (employer could not recover lost earnings and profits resulting from negligent injury to its employee); *Fidelity and Cas. Ins. Co. of New York v. Sears, Roebuck & Co.,* 124 Conn. 227, 233–36, 199 A. 93 (Conn.1938) (insurer could not recover for injuries suffered by insured's employees as the result of defendant's negligence). Without exception, courts have required insurers seeking to recover for amounts paid as the result of injuries to others to rely on the remedy of subrogation. *See Great Am. Ins. Co. v. United States,* 575 F.2d 1031, 1033–35 (2d Cir.1978). Kentucky law appears to be in accord with this approach. *See Zurich Am.Ins. Co. v. Haile,* 882 S.W.2d 681, 684–85 (Ky.1994) (compensation carrier's rights against a third-party tortfeasor are entirely derivative, and are not independent of the injured party's tort claim); *Fireman's Fund Ins. Co. v. Government Employees Ins. Co.,* 635 S.W.2d 475, 475–76 (Ky.1982). Thus, two threads of cases and many decades of precedent suggest that the Funds have no right to sue directly for the medical expenses of Participants injured by Defendants.

The Funds nonetheless suggest that the circumstances of this case are different enough, egregious enough, and the consequences so far-reaching, that the logic supporting the general rule should not apply in this and, presumably, in other similar cases. The Funds say that only they have "the resources, ability and incentive to pursue these claims." The Court is uncomfortable with this suggestion as the basis for sidestepping the accepted rule. Having power, resources, and incentive is simply not sufficient reason to relax one hundred years of sound principles allowing only those with direct injuries to bring suit. Much mischief and unfairness would follow from adopting new law upon that rationale. Moreover, this argument summarily dismisses the possibility that the Participants themselves might pursue the vindication of their own rights in court. Despite the many difficulties in pursuing a civil remedy, numerous individuals file products liability claims every day. A sufferer of smoking-related illness has no less incentive to seek compensation from the tobacco industry. Many have already done so. That a mega-lawsuit aggregating the claims of thousands may be more efficient or convenient is not a reason to jettison a time-tested legal doctrine. These are arguments that would be more appropriately made by the Participants themselves seeking class certification.

The Funds also repeatedly emphasize that their injuries were a foreseeable result of the Defendants' conduct. Moreover, they say that an action such as this is their only means of recovering their own damages. The Court finds neither of these arguments persuasive. The Funds seem to suggest that reasonably foreseeable injuries should be seen as the proximate result of tortious conduct and, thus, neither remote nor indirect. True, foreseeability is one element of the inquiry into proximate causation. However, in the particular context of this case, such proof does not sidestep the bar against recovery for derivative injuries. Courts have frequently held insurance companies to be remote plaintiffs, despite the fact that paying

---

**2.** "We decide, that in the absence of any privity of contract between the plaintiffs and defendants, and of any direct obligation of the latter to the former growing out of the contract or relation between the insured and the defendants, the loss of the plaintiffs, although due to the acts of the railroad company, being brought home to the insurers only through their artificial relation of contractors with the party who was the immediate subject of the wrong done by the railroad company, was a remote and indirect consequence of the misconduct of the defendants, and not actionable." *Connecticut Mutual,* 25 Conn. at 276–77.

a medical or life insurance claim is clearly the foreseeable result of injury to an insured. These precedents suggest that foreseeability is only one elements of directness. The Funds have provided no cases to the contrary.

The "general interest in deterring injurious conduct" would not be served by allowing both the Participants and the Funds the right to bring suit to recover for the same injuries. *Holmes,* 112 S.Ct. at 1318. Moreover, the interest in judicial economy would be undermined by creating a situation in which recovery for various aspects of a single injury might be pursued piecemeal in duplicative lawsuits, some brought by the Funds and others brought by their Participants. For all these reasons, the Court finds no basis for permitting the Funds to recover the Category One Claims damages under any of the causes of action set forth in the Amended Complaint.

### III.

Having dispensed of the Funds' Category One Claims, the Court now proceeds to examine the viability of the Funds' Category Two Claims. In Count III, the Funds allege violations of the Sherman Act, 15 USC § 1, which makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ." In essence, they contend that the Defendants conspired to suppress research, information, and competition that would have led to the development and marketing of a safer cigarette, with dire consequences for smokers. The Funds claim that smokers would have purchased the safer cigarette and, consequently, suffered fewer cigarette-related health problems. As a result, the Funds would have incurred fewer smoking-related medial expenses.

The Funds expand on this antitrust allegation by contending that the tobacco industry interfered with the health care marketplace by suppressing information on the health effects of smoking. According to the Funds, the lack of accurate information on the health effects of smoking interfered with the Funds' decisions regarding coverage, deductibles, and co-pays. The Funds contend that, if they had possesses accurate information, they would have shifted costs of smoking-related illnesses to smoking Participants. Finally, the Funds claim that Defendants retarded the development of smoking cessation programs. All of these acts and damages seem premised exclusively upon Category Two Claims.

The Funds press their claim under § 4 of the Clayton Act, which creates a private cause of action for antitrust violations. *See* 15 U.S.C. § 15. Under this provision, a plaintiff must prove that he suffered an injury "by reason of" the defendant's antitrust violation. The Supreme Court has read that phrase to contain a proximate cause requirement. Curiously, however, this causation requirement is called "antitrust standing." In any event, it embodies traditional limits on remoteness. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 537–545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court set forth the criteria for antitrust standing.[3] One of the factors—antitrust injury—is more than a factor; it is a necessary condition of antitrust standing. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 489–90, 93 L.Ed.2d 427 (1986); *Southwest Suburban Bd. of Realtors v. Beverly Area Planning*

---

**3.** The factors identified by the *Associated General Contractor's* Court are: 1) the causal connection between the antitrust violation and the harm to the plaintiff; 2) the defendant's intent to cause that harm; 3) the antitrust nature of the plaintiff's injury; 4) the directness of the plaintiff's injury; 5) the speculative nature of the plaintiff's damages claim; 6) the existence of more direct victims who could vindicate the public interest; and 7) the limits of judicial manageability due to the potential for duplicative recovery or complex apportionment of damages. *See* 459 U.S. at 537–

45, 103 S.Ct. 897; *see also* Nat Stern & Kevin B. Getzendanner, *Gauging the Impact of* Associated General Contractors *on Antitrust Standing Under Section 4 of the Clayton Act,* 20 U.C. Davis L.Rev. 159, 170–71 (1986); Sean Lanphier, *Antitrust Standing and the Health Insurer,* 8 Health Lawyer 8, 9 (1996). Officially, the Sixth Circuit lists only five factors, lumping intent with causation and combining directness with speculativeness. *See, e.g., Apperson v. Fleet Carrier Corp.,* 879 F.2d 1344, 1351 (6th Cir.1989).

*Assoc.*, 830 F.2d 1374, 1377 (7th Cir.1987). Generally speaking, "antitrust injury ... is ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).[4] "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* 97 S.Ct. at 697. In other words, a plaintiff "can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 1894, 109 L.Ed.2d 333 (1990). The Sixth Circuit has further refined the test for antitrust injury by explaining that a court should look to see if the plaintiff fell within the "target area" of the anti-competitive conduct. *See Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1438 (6th Cir.1990). In *Langenderfer*, the court reiterated the principle that a mere "relationship with the target" of the anti-competitive conduct failed to suffice. *See id.* In *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1351 (6th Cir.1989), the Court added another layer of gloss to the concept of antitrust injury by stating that the plaintiff's injury must be inextricably intertwined with the antitrust violation.

█ One of the Funds' allegations is that Defendants prevented other tobacco companies from developing and marketing safer cigarettes. Thus, the Plaintiffs allege that Defendants suppressed new products within the marketplace of cigarettes. This seems like the kind of assault on the free market that Congress intended the antitrust laws to address.[5] On the other hand, the Funds' allegations present a difficult question regarding the connection between the alleged injury and the alleged antitrust violation. As the Supreme Court stated in *Atlantic Richfield*, the antitrust injury requirement "insures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." 495 U.S. at 342, 110 S.Ct. 1884. This description of the antitrust injury builds on the Court's earlier teaching that:

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation. It should, in short, be "the type of loss that claimed violations ... would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 479, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Research*, Inc., 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)).

While the Funds' injury under this theory does have a causal connection to Defendants' conduct, it is unrelated to the anti-competitive nature of Defendants' activity. Anti-competitive damages harm the marketplace. Such harms typically include the payment of higher prices and the loss of profits from a competitive opportunity. Recovery for these harms compensates the plaintiff for a loss of position in the marketplace. The antitrust laws do not provide recovery for all injuries for the simple reason that many injuries are not marketplace injuries. In this case, the marketplace injuries caused by Defendants are the loss of profits suffered by the company that gave up their plans to market a safer cigarette, the loss of choice by cigarette consumers, and the possibility of higher prices paid by consumers in a less competitive market.

The Funds do not seek to recover for any of these typical harms. Instead, they seek to recover medical costs for illnesses caused by Defendants' anti-competitive behavior. Allowing the Funds to recover would punish Defendants for some of the human and finan-

---

4. It stands to reason that such "antitrust injuries" would be to a business or property. It is not easy to conceive of antitrust injuries as deriving from individual personal injuries.

5. The Court believes that the Category Two Claims do not assert merely personal injuries. *Just because the measure of the damages derives from the Participants' personal injuries does not disqualify the Funds' claims.*

cial harm caused by their suppression of a safer cigarette, but it would not constitute a measure of the anticompetitive harm to the marketplace. The medical costs do not reflect the anti-competitive conduct because they do not compensate a market participant for an economic injury. From this analysis, it seems that the Funds clearly do not fall within the target area of Defendants' conduct.

The Funds also allege an antitrust injury due to Defendants' suppression of information on the health effects of smoking and the suppression of the development of smoking cessation programs. At first blush, it would seem incredible to claim that the tobacco industry could commit anti-competitive conduct within the health care industry. After all, these are not just separate markets within the same sphere, they are two separate parts of the economy. The Funds claim that Defendants suppressed information as part of an overall defense strategy, a strategy designed to prevent lawsuits and preserve the cigarette market.

The Funds rely upon *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), to support their claim that withholding information can violate the antitrust laws. In that case, a group of dentists attempted to organize the profession to refuse to provide x-rays to insurance companies which requested the information before approving procedures. The Court explained that the withholding of important information disrupted the essential functioning of the marketplace and violated the antitrust laws. The *Indiana Federation of Dentists* Court explained, however, that the dentists' refusal to cooperate diminished competition among dentists.

The Funds, however, attempt to stretch *Indiana Federation of Dentists* to cover a situation in which a conspiracy of companies in one industry reaches out and interferes with a second industry even though the second industry is not a competitor or consumer of the first. While the Funds may be correct that the cigarette industry's alleged suppression of information disrupted the health care marketplace, the Funds do not sufficiently allege that this suppression of information constituted anit-competitive conduct. *Indiana Federation of Dentists* held that when a group of dentists within the dental care industry refused to provide information to the insurance industry, that conduct may have chilled competition within the dental industry and, thus, violated the antitrust laws. It does not follow that an antitrust violation has occurred if the entire cigarette industry refused to provide accurate information to the health care industry and that conduct merely impaired the proper functioning of the health care marketplace. The difference between *Indiana Federation of Dentists* and this suit lies in the fact that, in the Indiana case, the dentists committed anticompetitive conduct against members of their own industry. Here, the Funds do not allege that members of the cigarette industry acted against other members of the same industry or, even, that members of the cigarette industry acted against competitors or consumers within the health care industry. The Funds merely contend that the bare denial of information from one industry to another violated the Sherman Act. *Indiana Federation of Dentists* cannot support such a dramatic proposition and the case does not stand for a broad enough rule of law to accommodate the Funds' allegations.

Furthermore, to use the language of *Brunswick*, the Funds' injuries do not flow from or reflect the alleged anticompetitive conduct. Instead of claiming an injury immediately caused by the tobacco industry's suppression of information, the Funds contend that the Defendants' activities caused them to make poor management decisions. These poor decisions are not even the focus of the Funds' damage claim. They seek recovery for an injury even further removed. The Funds request compensation for those smoking-related health care costs they could have avoided through superior decision making. In other words, the Funds attempt to use the antitrust laws to obtain recompense for an injury several steps distant from the alleged anticompetitive conduct. At this distance, the Funds' injury no longer reflects the harm to the marketplace. Furthermore, at such a level of removal the Funds cannot establish that their injury flows from the

impermissible anticompetitive conduct rather than from a host of other causes. Therefore, the Funds do not make out an antitrust injury under any of their theories of the case.

This conclusion comports with Supreme Court precedent. The Court's antitrust standing cases have tended to limit claims to purchasers and competitors most immediately harmed by illegal restraints on competition. For instance, in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Court held that municipal purchasers of completed masonry structures could not recover treble damages against concrete block manufacturers who engaged in an illegal price-fixing scheme. The alleged overcharges had passed through masonry contractors and general contractors before reaching the plaintiffs. In denying standing to the ultimate purchasers in the chain of distribution, the Court cited concerns with "massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* 97 S.Ct. at 2072. It concluded that "the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws under § 4 ... is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." *Id.* 97 S.Ct. at 2075 (internal citations and quotes omitted).

*Illinois Brick* teaches that the antitrust laws vindicate the rights of the most directly injured party. Because the Funds measure their damages under every one of their theories by the health costs of smoking-related illness, this Court concludes that several crucial steps separate the Defendants' conduct from the Funds' injury. Thus, this case presents the same sort of concern that motivated the *Illinois Brick* Court to deny standing. Both the plaintiffs in *Illinois Brick* and the Funds are separated by several levels of abstraction from the injury that measures the damages. In *Illinois Brick,* the plaintiff sought recovery for an overcharge initially paid by a purchaser several steps up the economic chain. In this case, the Funds seek compensation for the costs of smoking related-illnesses suffered by their Participants. While the Funds do better by alleging conduct directed at them, their injury seems distant from that conduct and, critically, seems to overlap with an injury borne by the smokers themselves. Therefore, this case evokes the same concerns as *Illinois Brick.*

Nor is the Court persuaded that *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), a case upon which the Funds rely heavily, can support a different conclusion in these circumstances. *McCready* involved a health plan subscriber who was refused reimbursement for psychotherapeutic services rendered by a psychologist. Her health plan's practice was to reimburse for services provided by psychiatrists but not by psychologists, unless the treatment was supervised by and billed through a physician. McCready alleged that this arrangement was an illegal restraint on trade which injured her by forcing her to pay for her psychologist's services out-of-pocket. Despite the fact that the goal of the antitrust conspiracy was to shield doctors from encroachment by psychologists, the Court held that antitrust standing could not be restricted merely to targeted competitors. *Id.* 102 S.Ct. at 2548. McCready's injury was not remote, because it "was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* Although McCready was not an injured competitor, she was a consumer of psychotherapeutic services whose injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists in the psychotherapy market." *Id.* at 2551. Therefore, her injury was of the sort Congress intended to prevent in enacting the antitrust laws. *Id.*

In *Associated General Contractors,* the Court distinguished *McCready.* In contrast with McCready, the union in the *Associated General Contractors* case was neither a consumer nor a competitor in the market in which trade was restrained. *See Associated General Contractors,* 103 S.Ct. at 909. Its injuries were not integral to the antitrust conspiracy. Indeed, "it is obvious that any such injuries were only an indirect result of whatever harm may have been suffered by

'certain' construction contractors and subcontractors." *Id.* at 910. Unlike the subscriber in *McCready,* who suffered her own distinct injuries, the union in *Associated General Contractors* was attempting to recover for injuries suffered more directly by contractors and subcontractors. *See id.* "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general." *Id.* 103 S.Ct. at 910–11. Moreover, unlike in *McCready,* "[p]artly because it [was] indirect and partly because the alleged effects on the Union may have been produced by independent factors, the Union's damages claim [was] also highly speculative." *Id.* 103 S.Ct. at 911.

This case is more akin to *Illinois Brick* and *Associated General Contractors* than to *McCready.* The Funds complain about the distant, consequential harms of anti-competitive activity. Many of the same factors that led the Supreme Court to deny antitrust standing in *Illinois Brick* and *Associated General Contractors* lead this Court to the same conclusion here. First, the Funds are one full step removed from the harm to their Participants. They are also neither competitors of the Defendants nor consumers of their products. Their injuries, purely derivative of the injuries of the consumers of cigarettes, do not seem to be of the sort the antitrust laws were designed to prevent. This is not a case, as in *McCready,* where the damages to the plaintiff were a necessary incident to the alleged antitrust conspiracy and were intertwined with it, not merely an arguable consequence of it. The relationship of the Funds' injuries to the suppression of competition in the market for a safer cigarette is purely incidental. Similarly, the Funds' claimed injuries from alleged suppression of information do not reflect or flow from anticompetitive conduct.

For all these reasons, the Funds' alleged injuries have neither of the characteristics nor the proximity required by antitrust jurisprudence. Therefore, they lack standing to bring suit under § 4 of the Clayton Act.

## IV.

In Counts I and II, the Funds allege RICO violations under 18 U.S.C. § 1962(a), (c), and (d). The alleged predicate acts consist of mail and wire fraud pursuant to 18 U.S.C. § 1341 and § 1343. The Amended Complaint alleges a pattern of racketeering by which Defendants defrauded tobacco consumers along with those members of the public and governmental agencies responsible for regulating tobacco. The Defendants' fraudulent acts allegedly prevented the Funds from (1) "participating" in a market for safer cigarettes; (2) providing incentives to the Participants to use safer cigarettes; and (3) taking action to cause the Participants to quit smoking. The purpose of the civil conspiracy, say the Funds, was to shift the cost of health care from Defendants to the Funds. As a consequence, the Funds say that they were damaged by having to pay for the health costs of the Participants' tobacco-related illnesses. They seek treble damages under 18 USC § 1964(c) which permits an action by "[a]ny person injured in his business or property by reason of a violation of section 1962. . . ." To qualify as a permissible plaintiff under civil RICO, the Funds must demonstrate (1) injury to business or property and (2) RICO standing (i.e., proximate causation). *See Holmes,* 112 S.Ct. at 1316–18.

### A.

As a preliminary matter, the Court must consider whether the Funds fall within RICO's protected "zone-of-interests." The Funds' injuries must flow from the harms that the predicate acts were intended to cause. *See In re American Express Co. Shareholder Litigation,* 39 F.3d 395, 400 (2d Cir.1994). Only the direct targets of the conspiracy have standing as intended beneficiaries of RICO laws. *See Abrahams v. Young & Rubicam Inc.,* 79 F.3d 234, 238 (2d Cir.1996). RICO's target requirements, however, are not so narrow and well-defined as those which apply to antitrust injury. Because the injuries described under Category Two Claims are premised upon misconduct directed at the Funds, the Category Two

RICO claims cannot be summarily dismissed as too remote. Moreover, the allegations of the Amended Complaint seem to bring the Funds within the RICO zone-of-interests.

■ More specifically, to fall within RICO's zone of interests, the Funds must seek damages for injuries to business or property, rather than for personal injuries. Other courts have dismissed similar RICO claims as solely derivative of the Participants' smoking related personal injury claims. *See, e.g., Stationary Engineers Local 39 Health and Welfare Fund v. Philip Morris, Inc.*, No. C–97–01519, 1998 WL 476265, at *9 (N.D.Cal. April 30, 1998). At this point, the Court concludes that the Amended Complaint does assert RICO claims for injury to business, even though they are measured by the Participants' medical expenses. Based upon the pleadings alone, the Court does not see a basis for dismissing these claims on RICO's specific standing grounds. The Court will reconsider these findings at an appropriate time.

## B.

The Supreme Court has applied common law principles to statutory standing under federal RICO. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992). In *Holmes*, Justice Souter summarized the contemporary explanation of the standing analysis:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of plaintiff's damages attributable to the violation, as distinct from other, independent factors.... Second quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries.... And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems at-

tendant upon suits by plaintiffs injured more remotely.

*Id.* 112 S.Ct. at 1318 (internal citations omitted).

Justice Souter explained that the policy reasons against permitting recovery by plaintiffs deemed remote. They include (1) the difficulty of determining what portion of the plaintiff's damages actually resulted from the defendant's conduct, as opposed to other causes; (2) complicated damages-apportionment rules needed to prevent multiple recoveries for the same injury; and (3) a preference for relying on the directly injured to vindicate their rights under the law. *See id.* at 1318. Because, as the *Holmes* Court explained, the RICO and the Clayton Act provide the same kind of civil remedy, the Court imposed the same kind of standing requirement applied by *Associated General Contractors*. *See id.* 112 S.Ct. at 1317. Therefore, it may make sense to look at the lengthier list of factors detailed by *Associated General Contractors*. Because of the unique antitrust injury requirement under the Clayton Act, however, the Court prefers to treat RICO standing and antitrust standing as distinct tests, although arising out of the same body of common law.

■ The first of the *Holmes* factors concerns whether the remoteness of the plaintiff makes proving causation too improbable. In a RICO action, even if comparative fault were not at issue, proving actionable causation would still be paramount for the Funds. For instance, it would be very difficult to assess whether it was the Defendants' conspiracy against the Funds, the deception of the Participants, the Participants' own actions, or the Funds' own inaction, which caused the alleged additional medical expenses. Proving causation where so many remote contingencies abound raises great concern about the appropriateness of the Funds as plaintiffs in a RICO action. That the Funds' injuries are likely to have been caused by other factors makes these claims highly speculative.

On the other hand, the RICO standing test contains no strict requirement like antitrust injury. *See id.* 112 S.Ct. at 1318 n. 15.

Thus, even though the Court harbors grave concerns over the causation of the Funds' alleged injury, the Court also takes note of the Funds' efforts to plead a viable case. The Funds allege conduct directed at them, rather than at the Participants. By making this allegation, the Funds alleviate any concern over their remoteness. *Holmes,* itself, applied the standing test to cut off recovery by a remote plaintiff, not to cut off recovery by a direct plaintiff simply because of the difficulty in establishing a direct injury. *See id.* 112 S.Ct. at 1319–20. A remote plaintiff faces a significant challenge in establishing that its alleged injury was caused by the defendant. A direct plaintiff, however, enjoys a presumption that the defendant caused its injury. Since the Funds allege that they are a direct victim of the Defendants' misconduct, the Court will presume that this allegation carries with it the claim that the Defendants caused some portion of the Funds' injury. The Court will not reject the claim because of possible difficulty in proving the extent to which the Defendants caused all of the Funds damages.

With regard to *Holmes'* second factor, the Funds alleged damages do raise some concerns about apportionment, but not enough to defeat RICO standing on a motion to dismiss. As the Defendants note, if the Funds recover for health care costs, then arguably any recovery by individual Participants would need to be reduced accordingly. Calculating the reduction would be particularly difficult because the Funds do not seek compensation for all smoking-related health expenses, just those that the Funds could have avoided without the Defendants' misconduct. On the other hand, the Funds seek to recover for an injury quite different from any for which an individual Participant might sue. The Funds request damages to compensate the trusts for economic injuries caused by the Defendants' fraud. As such, the Funds are acting on behalf of both their smoking and non-smoking Participants by alleging that the Defendants damaged the financial integrity of various trusts and, thus, their ability to provide the optimal benefits to all Participants. Even if individual smoking Participants filed suit, they would recover only for individual medical costs.

The final criterion is whether the litigation is necessary to deter the injurious conduct. The answer to this question has many dimensions. To some extent, this litigation does serve a useful purpose. No one other than the Funds can effectively vindicate the injuries to the trusts. This is especially true of any injuries suffered by non-smoking Participants who have lost out on the potential benefits the trusts could have provided if they did not have to pay such large medical bills for smoking-related illnesses. However, the legitimate purpose of this suit is burdened by some difficult considerations. Individual smokers and state governments have a more direct interest in pursuing fraud by the tobacco industry. Each have had some success in those efforts. Moreover, litigation is not the only means of deterring improper conduct. It is quite likely that federal legislation will ultimately play the major role in addressing the allegedly fraudulent conduct of the cigarette industry.

Considering the *Holmes* factors raises many thorny problems. At this time, the amended pleadings suggest sufficient reasons for the Funds to be allowed to pursue the Category Two Claims under RICO. The Court reaches this view with considerable reservation, arising primarily from the improbability of the allegations that Defendants targeted the Funds and the unlikelihood that the Funds' case produce anything other than bold opinion and speculation to support important this element of the RICO claim. In other words, the Court expects the Funds to substantiate their claim that they are a direct victim of RICO conduct. The Court expects that the Funds will need to weather a summary judgment motion. Since, the Court believes that RICO standing is a required element of a RICO claim, *see supra* note 1, the Funds must present some actual evidence on the directness of their injury.

Therefore, the Court allows the RICO claim to proceed only at this very preliminary stage of litigation. In ruling on this motion to dismiss, the Court has focused only on the question of whether it would be impossible for the Funds to adduce proof to sustain their various allegations. Later in

this litigation, the Court expects several of the questions resolved today to recur. When those questions come up again, the Funds will need to do more than show that proof is possible, they will actually need to shoulder the difficult task of producing that proof.

This analysis need not directly address at this time several issues which may ultimately present the Funds the greatest difficulty. The Funds must eventually show that they actually relied upon Defendants' public statements and activities. Moreover, they must demonstrate that they would have taken actions which could have reduced their medical expenses. Finally, the Funds must demonstrate their damages in some manner which is not speculative. As to each of these issues, the Court sees difficulties which could well be insurmountable. In many respects, the Amended Complaint raises a great deal more questions about the validity of the remaining claims than the Funds have yet to answer.

## V.

In Count V, the Funds allege that Defendants fraudulently concealed information about the dangers of smoking and that the Funds reliance on this incomplete information in resulted in fewer efforts to discourage and reduce tobacco use by their Participants. This allegation, therefore, appears to be another Category Two Claim. The Court considers this claim next because the allegation of fraud seems to form the basis for the Funds' alleged RICO predicate offenses of mail fraud and wire fraud. The analysis of fraudulent concealment, thus, dovetails with the Court's conclusions regarding the Funds' RICO claim.

▬▬▬ In order to state a claim for intentional misrepresentation, the tort of deceit, a plaintiff must properly allege (1) that the defendant made a false statement or concealed the truth; (2) about a material fact; (3) that the defendant knew his statement was not true; (4) that the defendant intended to deceive the plaintiff; (5) that the

plaintiff relied on the deception; and (6) damages resulting from the deception. *See Wahba v. Don Corlett Motors, Inc. .*, 573 S.W.2d 357, 359 (Ky.Ct.App.1978); *Scott v. Farmers State Bank*, 410 S.W.2d 717, 720 (Ky.1966); *see also* Prosser and Keeton on Torts § 105 (5th ed.1984). These elements must be shown by clear and convincing evidence. *See Wahba*, 573 S.W.2d at 359. From the face of the complaint, it appears that the Funds have stated facts sufficient to prove (1) through (3).

▬▬▬ The Funds also appear to allege that Defendants specifically intended to deceive the Funds—that the Funds were targets of the Defendants' deceit. The logic behind this factual allegation is never entirely explained. Whether the Funds have stated a claim for deceit does not depend, however, on whether this allegation is plausible. Kentucky courts have long held that a third party not the target of an alleged tortfeasor's deceptions may state a claim for deceit so long as it was reasonably foreseeable that he would receive and potentially act on them. *See Highland Motor Transfer Co. v. Heyburn Building Co.*, 237 Ky. 337, 35 S.W.2d 521, 523–24 (1931).[6] The Funds' factual allegations make it plain that the Funds were the foreseeable recipients of Defendants' communications to the smoking public and the public at large.

▬▬▬ The fifth requirement appears to pose a potential problem for the Funds, though not necessarily an insurmountable one. Under Kentucky law, the Funds must show that their reliance on Defendants' misrepresentations was reasonable. *See Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1447 (6th Cir.1993). A plaintiff's knowledge and experience are relevant to a determination of whether his reliance was reasonable. *See Vest v. Goode*, 307 Ky. 52, 209 S.W.2d 833, 836 (1948); *see also* Prosser & Keeton on Torts § 108 (5th ed.1984) ("one who has special knowledge, experience and competence may not be permitted to rely on

**6.** At first blush, *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068 (W.D.Ky.1995), might appear to suggest that only the intended target of the deception may recover for this tort. However, in

that case, the plaintiff did not claim that it relied on any of the alleged misrepresentations and was merely attempting to stand in the shoes of third-party customers. *See id.* at 1086.

statements for which the ordinary man might recover").[7]

As to this Count, the Court resolves the standing questions by the same analysis applied to the RICO claims. The Court has the same reservations about the Funds' ability to ultimately demonstrate the fundamental elements of fraud. For the time being, however, the Court will allow these claims to proceed.

The Funds suggest, based on a case involving facts similar to this one, that even if the Court found the Category Two Claims to be remote, the doctrine should not be strictly applied when intentional conduct is alleged. See City and County of San Francisco v. Philip Morris, Inc., 957 F.Supp. 1130, 1141 (N.D.Cal.1997). The Court disagrees because the federal court in California properly relied on California cases applying the principle that one who makes fraudulent misrepresentations is liable to any person or class of persons he has reason to expect will reasonably act on them. See Restatement (Second) of Torts 531; Prosser and Keeton on Torts, 743–45 (5th ed.1984). However, the concepts which the Funds promote and which the federal district court in California adopted are quite distinct. That Kentucky courts have permitted plaintiffs to sue for injuries resulting from misrepresentations made to or intended for third parties does not carry the implication that a plaintiff may recover derivatively· for injuries actually suffered by a third party. See Highland Motor Transfer Co. v. Heyburn Building Co., 237 Ky. 337, 35 S.W.2d 521, 523–24 (1931); Graham v. John R. Watts & Son, 238 Ky. 96, 36 S.W.2d 859, 861–63 (1931).[8] In Highland Motor Transfer

and Graham, the plaintiffs were permitted to bring suit because it was foreseeable that they would act upon the defendants' misrepresentations to their detriment. However, they were clearly attempting to recover for their own injuries, not those derived indirectly from another. To allow recovery for derivative harm would push these precedents far beyond their logical limits. Kentucky has not yet done so. The Court finds no sound basis for predicting that it would now. The impact of this decision remains to be seen. As noted, the Funds will need to prove the directness of their injuries as this suit progresses.

VI.

In Count IV, the Funds claim that Defendants have violated various provisions of the Kentucky Consumer Protection Act, including Ky.Rev.Stat.Ann. § 367.170, § 367.175, and § 506.040. They contend that Defendants' deceptions and their conspiracy in restraint of trade damaged the Funds and their Participants by causing more smoking-related illnesses and higher health care costs. Section 367.170 makes unlawful "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce."

The Funds cannot recover under § 367.220, which provides a private remedy to "[a]ny person who purchases or leases goods or services primarily for personal family or household purposes and thereby suffers any ascertainable loss of money or property as a result of" a violation of § 367.170. That remedial provision requires that "privity of

7. Given the widespread evidence available to the public on the hazards of smoking, it seems farfetched that a health and welfare trust funds with an obligation to improve the health of their members could justifiably forego all smoking cessation efforts in reliance on information disseminated by tobacco companies. In the face of all the available information, including government required health notices, the Funds apparently took little action to stop the smoking habits of the Participants. It seems speculative at best to consider what action the Funds might have taken under different circumstances. In spite of these many questions, the Court is willing to allow the Funds the chance to procure facts to support this scenario.

8. Some cases contain language suggesting the more ambitious proposition that allegations of scienter somehow relax the requirement of proximate causation in a tort suit. See Johnson v. Greer, 477 F.2d 101, 106 (5th Cir.1973). The Court has found no Kentucky cases taking this position. Moreover, the Court believes that these holdings are probably limited to situations in which an intentional tort has resulted in unforeseeable and separate injuries to the intended victim rather than derivative injuries to a third party. See id. at 107.

contract exist between the parties in a suit alleging a violation of the Consumer Protection Act." *Skilcraft Sheetmetal v. Kentucky Machinery, Inc.*, 836 S.W.2d 907, 909 (Ky.Ct. App.1992). Since the Funds purchased nothing from Defendants, and were not otherwise in privity with them, § 367.220 provides no recovery.

 The Funds nonetheless contend that they may recover for violations of § 367.170 via another provision, § 446.070. This second statute provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." § 446.070. In order to recover under this statute, the Funds must be within the class of persons intended to be protected by § 367.170. *See White v. Turfway Park Racing Ass'n*, 718 F.Supp. 615, 621 (E.D.Ky.1989). However, the Funds appear to fall outside that class. *See Skilcraft*, 836 S.W.2d at 909 ("The Consumer Protection Act is remedial legislation intended to give *consumers* broad protection from illegal acts.") (emphasis added); *Com. ex rel. Cowan v. Telcom Directories*, 806 S.W.2d 638, 642 (Ky.1991) ("The legislature enacted K.R.S. 367.170 *et seq.* to afford state jurisdiction and individual remedies for those protected by this consumer legislation."). Moreover, because the Kentucky legislature provided consumers with a specific remedy under § 367.220, the Court believes that an alternative remedy should not be available under § 446.070. *See Skilcraft*, 836 S.W.2d at 910. For these reasons, the Funds have no remedy under § 446.070.[9]

 The Funds also argue that they should be able to recover for violations of § 367.170 via § 367.200, which permits a court to "make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property ... which may have been paid out as a result of any practice declared to be unlawful by KRS 367.130 to 367.300." They contend

that since they are parties in interest, the Court has the power to order relief for injuries suffered by them due to violations of § 367.170. However, this position is inconsistent with the statutory scheme. Section 367.200 immediately follows § 367.190, which authorizes the Attorney General to seek injunctive relief to prevent violations of § 367.170. In context, § 367.200 seems intended to permit a court to order relief for the consumers on whose behalf the Attorney General has successfully brought suit. *See Com. Ex Rel. Beshear v. ABAC Pest Control*, 621 S.W.2d 705, 706 (Ky.Ct.App.1981) ("We hold, therefore, that the legislature, in enacting KRS 367.200, intended to vest the Attorney General with the authority to seek restitution on behalf of defrauded consumers."). The statute was not intended to function as an individual remedy for private plaintiffs.

Finally, the Funds seek recovery under a separate provision of the Consumer Protection Act which makes unlawful anticompetitive conduct. Section 367.175 provides:

(1) Every contract, combination in the form of trust and otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall be unlawful.

(2) It shall be unlawful for any person or persons to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce in this Commonwealth.

\*\*\*\*

(4) In addition to any other penalties, violations of this section shall also be a Class C felony.

For reasons already stated, no recovery is available to the Funds through § 367.200. However, the Funds have a somewhat stronger argument that the Funds should be able to sue under § 446.070, since the Consumer Protection Act provides no civil remedies to private plaintiffs for violations of § 367.175. *See Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky.1985) ("Where the statute both declares the unlawful act and specifies the

---

9. Recovery under § 446.070 also requires that the plaintiff's injury be proximately caused by the violation of the statute. *See Shields v. Booles*, 238 Ky. 673, 38 S.W.2d 677, 681 (1931). For

reasons already discussed, Plaintiffs' Category One Claims are too remote and indirect to satisfy this requirement.

civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute.").[10]

■ Though no private civil remedy is specified, the Funds must still show (1) that they are members of the protected class, *see White*, 718 F.Supp. at 621, and (2) that the statutory violations proximately caused their injuries, *see Shields v. Booles*, 238 Ky. 673, 38 S.W.2d 677, 681 (1931). As to the first requirement, the Court believes that the Funds are not parties intended to be protected by the Consumer Protection Act. The preceding cases suggest that the entire Act, including the antitrust provisions in § 367.175, is intended to provide private civil remedies only to consumers. However, even if the Act were broadly construed to allow entities such as insurers and ERISA trust funds to recover for antitrust violations, the Funds would not be able to establish antitrust standing in this case. For reasons stated in the previous section, the Funds cannot satisfy this burden.[11]

## VII.

■ In Count VI, the Funds allege that Defendants breached a special duty which they voluntarily assumed when they issued statements that they intended to cooperate with public health officials and assist in research efforts into the effects of tobacco on public health. The Funds contend that they relied on these statements and, as a result, failed to take action to protect their insureds from the dangers of smoking. As pled, it is difficult to distinguish this claim from the misrepresentation claim. However, to cover the same territory again is unnecessary, because this tort theory, as pled, is not cognizable under Kentucky law.

The Court knows of no Kentucky case specifically adopting this theory. Kentucky case law does not make specific reference to "breach of a special duty." However, it has been held that "a duty voluntarily assumed cannot be carelessly undertaken without incurring liability therefore." *Estep v. B.F*

*Saul Real Estate Inv. Trust*, 843 S.W.2d 911, 914 (Ky.Ct.App.1992). In recognizing this principle, it appears that Kentucky has adopted § 323 and § 324A of the Second Restatement of Torts. *See Taylor v. United States*, 521 F.Supp. 185, 187 (W.D.Ky.1981); *see also McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1270 (6th Cir.1988). Both of these sections refer to the voluntary assumption of a "duty to render services to another." *See Taylor*, 521 F.Supp. at 188. Both sections also impose liability only for physical harm, though there appears to be at least one Kentucky case permitting recovery for a breach of an assumed duty resulting only in economic harm. *See Louisville Cooperage Co. v. Lawrence*, 313 Ky. 75, 230 S.W.2d 103, 104 (1950) ($ 3,000 worth of fire damage).

The facts of this case do not fit with this theory of relief, however. Defendants may have made vaguely promissory statements to the general public, but the complaint fails to allege that they assumed a duty to render services of any sort to the Funds. This is not a case like *Louisville Cooperage*, where the defendant, who undertook a contractual duty to wet down combustible wood shavings, was found negligent in allowing them to catch fire. *See id.* 230 S.W.2d at 105. The Funds have failed to allege that Defendants undertook to do anything specific for any particular person or entity, much less that they assumed a duty to render services of any sort to the Funds or to protect the health of their Participants. The facts show merely that Defendants indicated their interest in the public health and pledged resources to assist the scientific and public health communities with tobacco research. Precatory statements and generic expressions of intent such as these do not create legal duties. Moreover, the Funds have failed to allege any physical harm, which, as health and welfare plans, they obviously cannot. Any personal injuries obviously have been suffered only by the Participants. Therefore, the Funds' claims for breach of a special duty must be dismissed.

---

**10.** Civil money penalties for violations of § 367.175 are available under § 367.990(8), but only on petition of the Attorney General.

**11.** It therefore follows that the Funds also cannot recover damages under § 506.040 for criminal conspiracy to violate § 367.175.

## VIII.

In Count VII, the Funds claim that Defendants have been unjustly enriched by the Funds' payment of the medical claims of Participants injured by cigarette smoking. In order to properly plead a claim of restitution or unjust enrichment, a plaintiff must allege that a benefit has been conferred on the defendant and unjustly retained by him. *See Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F.Supp. 1198, 1206 (W.D.Ky.1995). This ordinarily would require the plaintiff to allege that he has discharged some debt or legal obligation incurred by the defendant. *See Chapman v. Blackburn*, 295 Ky. 606, 175 S.W.2d 26, 28 (1943) (payment of taxes owed by life tenant conferred benefit which, if retained, would constitute unjust enrichment); *see also Western Cas. & Sur. Co. v. Meyer*, 301 Ky. 487, 192 S.W.2d 388, 390 (1946); *Slater v. Bright*, 248 S.W.2d 915, 917–18 (Ky.1952). The Funds have not done this.

The fundamental flaw in the Funds' claim is their conclusory allegation that they have paid claims which Defendants ought to have paid. The Funds' argument falsely assumes that Defendants were or are obligated to pay the medical expenses of the Participants. A perceived moral duty is no substitute for a substantive legal requirement. Another court faced with a similar case said it well:

> If defendants have indeed been unjustly enriched, in that their profits were increased as a result of wrongful conduct, the enrichment was at the expense of individual smokers, not of the city and counties. Plaintiffs cite no benefit which has been conferred on defendants by plaintiffs themselves. Plaintiffs have not alleged that defendants owed any duty to individual smokers to cover the costs of their medical care. Rather, while conclusorily asserting that these costs "ought to have been borne by defendants," ... plaintiffs admit that it is in fact plaintiffs' independent statutory duty to pay these costs. While plaintiffs have unquestionably spent money on health care costs for the indigent as a result of tobacco-related disease, plaintiffs cannot show that this has in any way enriched defendants.

*City and County of San Francisco v. Philip Morris, Inc.*, 957 F.Supp. 1130, 1144–45 (N.D.Cal.1997). Similarly, in this case, the only parties who clearly had an established legal obligation to pay any medical expenses are the Funds. Since the Funds have pled no facts suggesting that they have conferred a benefit on Defendants, this claim must be dismissed.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The Court having considered Defendants' motion to dismiss and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion to dismiss is SUSTAINED in part and the Court DISMISSES with prejudice Counts III, IV, VI, VII, VIII, IX and X of the Amended Complaint.

IT IS FURTHER ORDERED that Defendants' motion to dismiss is DENIED as to

Counts I, II and V of the Amended Complaint.

The Court's deputy clerk will contact the parties for the purpose of arranging a scheduling conference.